# CITY OF KNOXVILLE v. DANA RYAN, Admr.

Eastern Section. November 2, 1929.

Petition for Certiorari denied by Supreme Court April 5, 1930.

Frank Montgomery, of Knoxville, for plaintiff in error.

John Jennings, Jr., and W. P. O'Neil, both of Knoxville, for defendant in error.

THOMPSON, J. The plaintiff below, Dana Ryan, administratrix of the estate of her father, Charles A. Thompson, deceased, has recovered a judgment for $7,500, and court costs, against the City of Knoxville for negligently causing the death of her said father. The City has appealed to this Court and has assigned error.

One of the contentions made by the City is that there was a variance between the allegations of the declaration and the proof as to how the accident happened.

The declaration alleged that the City negligently permitted a small bridge which constituted a part of Willow Street to be and continue in bad condition and repair in that it permitted a badly worn, loose and rotten plank in the flooring of said bridge to be and remain in said bridge for a long space of time; that it failed to inspect and make the necessary repairs by fastening or replacing said defective plank after it had knowledge or by the exercise of ordinary care could have had knowledge thereof, etc. It then alleged as follows:

"Plaintiff further avers that on the said 9th day of May, 1928 her intestate, the said Charles A. Thompson, now deceased, was driving a wagon drawn by a horse, on and along Water Street and Flordia (Ave.); that plaintiff's said intestate drove said horse and wagon wherein he was then and there riding, onto Willow Street bridge, and while in the act of riding in said wagon and driving the horse hitched to same across said Willow Street bridge, the said horse which was hitched to the said wagon, stepped on the end of said loose plank, which, due to the fact that it was worn, loose and not properly fastened in and on said bridge, flew up and struck the said Charles A. Thompson, plaintiff's intestate, on the head, knocking him from the wagon in which he was riding, fracturing his skull, breaking the bones in his face, and also breaking the bones in his shoulder, and otherwise by the force of said blow on the head from said plank, and from the force and violence with which plaintiff's said intestate, Charles A. Thompson, was knocked to the floor of said bridge, greatly hurting, bruising and wounding plaintiff's said intestate; and the said Charles A. Thompson, deceased, by reason of these facts and of said injuries inflicted upon him as aforesaid, was sick, sore, lame and disordered . . . and . . . did on the 14th day of May, 1928, die."

The testimony of the witnesses introduced by the plaintiff shows quite clearly that when the horse stepped on one end of the defective plank with one of his back feet the other end of the plank flew up, and (whether or not it actually struck Thompson) it at least struck the wagon with such force as to knock Thompson out of it. Only one witness for the plaintiff testified that the end of the plank went up as high as Thompson's head, and her testimony in this regard is not very satisfactory.

The witness for the City who removed the plank from the bridge after the accident brought it into Court during the trial and measured it before the jury. It was ten inches wide, three inches thick and sixty-eight inches long. This witness testified without contradiction that after the accident the plank was still fastened near its center to a sleeper which it crossed by two sixty penny nails which were six inches long. (The ends of the plank being unfastened and the

planking crossing the sill made a see-saw.)  This witness also showed that the nails were thirty-one and a half inches and twenty-nine inches respectively from one end of the plank and thirty-five and a half inches and thirty-eight inches respectively from the other end of the plank.  This same witness also testified without contradiction that the seat of the wagon on which Thompson was siting was four feet and six inches from the ground.

Plaintiff insists that these physical facts show that the plank could not have struck Thompson on the head and knocked him off the wagon as alleged in the declaration and therefore that there was a variance between the allegations of the declaration and the proof of how the accident happened.

It seems clear to us that the plaintiff's testimony at least shows that the end of the plank struck either the lower part of Thompson's body or his legs or the wagon with such force as to knock him out of the wagon.  He bled from the mouth, nose and ears and died from a fracture of the skull at the base of the brain.  Even if we treat the evidence as showing that the plank struck only the wagon but knocked Thompson off it, and that the fracture of the skull was caused by his head coming in contact with the floor of the bridge when he fell onto it, nevertheless it does not seem to us that there is such a fatal variance between the allegations of the declaration and the proof of how the accident happened as necessitates a reversal of the case. As hereinbefore shown the declaration alleged that the plank or end thereof "flew up and struck the said Charles A. Thompson, plaintiff's intestate, on the head, knocking him from the wagon in which he was riding, fracturing his skull, breaking the bones in his face, and also breaking the bones in his shoulder, and otherwise by the force of said blow on the head from said plank, and from the force and violence with which plaintiff's said intestate, Charles A. Thompson, was knocked to the floor of said bridge," etc.  It is true that the allegation is that he was struck in the head, but it is also true that the allegation is that he was knocked off the wagon, and was injured from the "force and violence" with which he "was knocked to the floor of said bridge."  So, as stated, we do not think there was a fatal variance.

Defendant made several special requests for charges to the jury with reference to this question of variance, i. e.:

"1.  I charge you that before the plaintiff can recover in this case she must have proved by a preponderance of the evidence that the accident happened in the manner alleged in her declaration, that is, that the end of the plank flew up and struck plaintiff's intestate and knocked him from the wagon."

"2. I charge you that if the accident occurred in some other manner than that alleged in the declaration the plaintiff cannot recover."

"3. I charge you that if the plank did not strike the plaintiff's intestate that there can be no recovery in this case."

"4. I charge you that even if the plank in question was partly rotten and even if the City was negligent in not replacing it before the accident, if the accident did not happen in the manner alleged in the declaration there can be no recovery in this case."

The Court had already told the jury that if the plaintiff did not prove her case substantially as alleged in her declaration she could not recover, and he declined these requests. In declining to give the requests we do not think he erred. We might add that ordinarily a question of variance between allegations and proof is one for the court—not for the jury.

Another insistence of the defendant is that the notices which the plaintiff served on the Mayor of the defendant were defective and were not served within the time required by Acts 1913, Ch. 55.

The accident happened on May 9, 1928, and the suit was instituted on June 29, 1928. The declaration alleged:

"Plaintiff further avers that heretofore, to-wit, on May 31, 1928, she gave to the defendant, City of Knoxville, and to the Honorable J. A. Fowler, Mayor of the defendant, City of Knoxville, written notice of the time and place where said injury was received by the said Charles A. Thompson, deceased, and the general nature of the injuries inflicted, as required by Chapter 55 of the Acts of the General Assembly for the year 1913, and that thereafter and within ninety (90) days of the time when the said Charles A. Thompson, deceased, was injured as aforesaid, she gave to the defendant, City of Knoxville, and its Mayor, a supplemental notice of the time and place, when and where the said Charles A. Thompson was injured as aforesaid, and of the nature of his injuries as required by said Act."

It will be observed that although the declaration alleged that the second or supplemental notice was served within 90 days after the accident, yet the date of its service was not alleged and it was not alleged that it was served prior to the institution of the suit. The only pleading which the defendant filed was a plea of not guilty.

The first notice, i. e., the one served on May 31, 1928, was as follows:

"To the Honorable James A. Fowler, Mayor of the City of Knoxville, Tennessee, and to the City of Knoxville, Tennessee:

"You are hereby notified that on the 9th day of May, 1928, on the Willow Street Bridge, one of the public bridges owned and maintained by the City of Knoxville, Tennessee, and which on said date

and for a long time prior thereto constituted and was a part of said street or thoroughfare known as Willow Street or Willow Avenue, Charles A. Thompson, while driving a wagon across said bridge, was struck and fatally injured by a loose plank, on or in the floor of said bridge, said plank striking the said Charles A. Thompson on the head, by reason of the fact that it was loose and not properly fastened in and on said bridge, so that when the horse which the said Charles A. Thompson was driving stepped on the end thereof, said plank flew up, and struck the said Charles A. Thompson on the head, knocking him from his wagon and fatally injuring him, as a result of which said injuries he died on May 14, 1928. Said injuries received by the said Charles A. Thompson were directly and proximately caused by the aforesaid dangerous condition of said Willow Street or Willow Avenue Bridge, which was knowingly, negligently and wilfully permitted to become and remain in said dangerous condition by the City of Knoxville, and remain in said dangerous condition for a long period of time prior to the injuries inflicted as aforesaid upon the said Charles A. Thompson. This notice is given to you as Mayor of the City of Knoxville, Tennessee, and to the City of Knoxville, Tennessee, pursuant to the provisions of Chapter 55 of the Acts of the General Assembly of the State of Tennessee for the year 1913.''

The second or supplemental notice, which was served on June 29, 1928, the day the suit was instituted, was as follows:

''To the Honorable J. A. Fowler, Mayor of the City of Knoxville, Tennessee, and to the City of Knoxville, Tennessee, a Municipal Corporation:

''Supplementing the notice given to you as Mayor of City of Knoxville, Tennessee, and to City of Knoxville, Tennessee, on May 31, 1928, relative to the injuries sustained by Charles A. Thompson on May 9, 1928, which injuries resulted in his death on May 14, 1928, said injuries being received by the said Charles A. Thompson while driving a wagon across a bridge on Willow Street within the corporate limits of the City of Knoxville, Tennessee. In order that the City may be more definitely advised as to the bridge on which said injuries were received by the said Charles A. Thompson, you are now notified that the bridge in question is the Willow Street bridge which constitutes a part of said Willow Street at the point where Water Street runs into or joins with Florida Street, said bridge crossing the creek near the point where Water Street joins or runs into Florida Street and said bridge crossing said creek at the point where Florida Street ends and Willow Street begins.

''This supplemental notice is given to you as Mayor of the City of Knoxville, Tennessee, and to City of Knoxville, Tennessee, pur-

suant to the provisions of Chapter 55 of the Acts of the General Assembly of the State of Tennessee for the year 1913.''

We might state here that it is urged in behalf of the City that both notices were defective in that they failed to sufficiently state the general nature of the injury or injuries sustained by Thompson; that the first notice was also defective in that it failed to sufficiently state the place where the injuries to Thompson were received; and also that although the proof showed that the second or supplemental notice was served on the Mayor on June 29, 1928, the day the suit was instituted, yet the proof failed to show that it was served on the Mayor before the suit was instituted.

The City filed only a plea of ''not guilty,'' but raised the questions in the following ways: At the conclusion of all the evidence the City moved for peremptory instructions on the ground among others that the notices were defective because not served within the proper time and because they did not describe the nature of the injuries. In the motion for new trial several grounds were based upon the insufficiency of the notices as to time and place of accident and description of the injuries, and upon their not being served within the proper time. After the motion for new trial was overruled defendant filed a motion in arrest of judgment upon the following grounds:

''1. The alleged first notice of the accident given by the plaintiff to the City of Knoxville was defective in that it did not locate the place of the accident and did not even locate the bridge on which it occurred.

''2. The proof fails to shows that the alleged second notice was served or delivered to the Mayor of the City before suit was brought, suit was therefore premature.

''3. Plaintiff's declaration fails to allege that the last notice was served or delivered on the Mayor of defendant City before suit was brought.''

This motion in arrest of judgment was also overruled.

It appears from the evidence that the accident happened on a bridge on Willow Street at the point where Water Street joins Florida Avenue. The bridge seems to have crossed a small creek and was about 30 feet long and 20 feet wide. There was another similar bridge on Willow Street crossing a creek—probably the same creek. There was no street other than Willow Street connected with this bridge.

Mr. J. B. McCalla, a witness for plaintiff, after describing the location of the two bridges and after testifying that the description used in the second or supplemental notice correctly described and definitely located the bridge on which the accident happened, was asked and answered as follows:

"Q. If on the other hand the notice of this accident had stated with reference to where the accident occurred as follows: "On the Willow Street Bridge, one of the public bridges owned and maintained by the City of Knoxville, which on said date and for a long time prior thereto constituted and was a part of said street and thoroughfare known as Willow Street or Willow Avenue, Charles A. Thompson, while driving a wagon across said bridge was struck," and so forth, then that would not definitely locate this bridge but would apply equally or perhaps more so to that other Willow Street Bridge that you have just mentioned, wouldn't it?

"A. It would be rather indefinite as there are two Willow Street bridges."

It will be observed that in asking the above question counsel quoted from the first notice, and the witness therefore testified in effect that the description used therein was "rather indefinite as there are two Willow Street bridges."

F. A. Brady, a witness for the defendant, after testifying about the location of the two bridges on Willow Street, and after testifying that the description used in the second or supplemental notice correctly described and definitely located the bridge where the accident happened, was asked and answered as follows:

"Q. Judge (meaning Judge Jennings, counsel for plaintiff) read you his last notice as a description of the bridge. He has described the bridge in the first notice as follows: "on the Willow Street bridge, one of the public bridges owned and maintained by the City of Knoxville, Tennessee, and which on said date and for a long time prior thereto constituted and was a part of said street or thoroughfare known as Willow Street or Willow Avenue, Charles A. Thompson," and so forth; if that was the only description you had given of this bridge, which of these bridges would it have applied to? A. Well, if you had given me that I would have known right where to have went to.

"Q. If it had been just like I read you? A. I would have went to the other bridge."

In view of the foregoing we are forced to the conclusion that the first notice was fatally defective in that it did not comply with the statute requiring that "a written notice shall be served upon the mayor . . . stating the . . . place where said injury was received."

The second or supplemental notice did correctly describe the bridge where the accident happened, and the bridge being small it was not necessary that the particular place on it be described. As hereinbefore pointed out, the declaration alleged that this supplemental notice was served upon the Mayor within 90 days after the

accident but did not allege that it was served before the institution of the suit. The suit was instituted on June 29, 1928. Mr. W. P. O'Neil, a lawyer associated with Messrs. Jennings, Saxton & Wright, attorneys for plaintiff, testified that he served the second or supplemental notice on the Mayor on June 29, 1928, and that the Mayor signed at the bottom thereof the statement: "I accept service of this supplementary notice, this 29th day of June, 1928." But O'Neil did not testify that he served the notice before the suit was instituted. Nor did any one else so testify.

As hereinbefore stated, one of the grounds of the defendant's motion for a directed verdict was on the ground that the notice was not served at the proper time, and one of the grounds of the defendant's motion for new trial was that the supplemental notice did not appear to have been served before the suit was brought.

On the hearing of the motion for new trial the plaintiff offered the affidavit of Mr. O'Neil that he served the supplemental notice on the Mayor on the morning of June 29, 1928, and that during the afternoon of that day and two or three hours after he had served the notice he filed the suit by filing with the clerk the pauper's oath upon which the summons was issued that same afternoon. The Court sustained the defendant's objection to the introduction of the affidavit but permitted the defendant to put it in the record. It was put into the bill of exceptions, and is also copied into the record at page 15. After the Court had overruled the motion for new trial the defendant filed a motion in arrest of judgment, the last ground of which was that: "Plaintiff's declaration fails to allege that the last notice was served or delivered on the Mayor of defendant City before suit was brought." And as hereinbefore stated, the Court overruled the defendant's motion in arrest of judgment.

If it was necessary that the plaintiff prove that the second notice was served before the suit was brought and if she failed to introduce such proof, the affidavit of Mr. O'Neil does not help the plaintiff, because a plaintiff in a jury case who has failed to prove some fact essential to a recovery cannot on the hearing of a motion for new trial introduce evidence to establish that fact and thus make out his case.

Now, the first notice was defective in that it failed to state the place where the injuries were received, and we do not believe that the statute would permit the curing of a defective notice by the serving of a supplemental notice after the time fixed by the statute for the serving of notice had expired.

Bearing in mind that the declaration alleged that on May 31, 1928 (the date of the first notice), the plaintiff served upon the Mayor of defendant written notice of the time and place where said injury was received and the general nature of the injuries as

required by the statute, and bearing in mind that May 31, 1928, was before the institution of the suit, the defendant could not have demurred to the declaration as a whole regardless of the allegations as to the supplemental notice. This, for the reason that the declaration alleged a full compliance with the statute. And this being true, no ground of the motion in arrest of judgment could properly have been sustained. The defendant might, however, have filed a special demurrer to that part of the declaration which alleged the serving of the supplemental notice upon the ground that there was no allegation that said supplemental notice was served before the institution of the suit. But the defendant did not do this.

The proof disclosed that the first notice was fatally defective in that it failed to properly state the place where the injury was received by properly describing the bridge. But laying aside for the present the question as to time of service of the second notice, the two notices read together did properly state the time and place where the injury was received, and the general nature of the injury inflicted, and together they constituted a full compliance with the statute. The bridge being only about 30 feet long and 20 feet wide, it was not necessary for the notices to set out the specific point on the bridge where the accident happened. With reference to the notices stating "the general nature of injury inflicted," a reading thereof would certainly impress the reader that the principal injury was to the head and that death resulted therefrom. And this is what the evidence showed.

Now, the proof showed that the supplemental notice was served within 90 days after the happening of the accident and therefore that insofar as the giving of proper notice was concerned the plaintiff had a good cause of action, although she may not have had it at the time the suit was instituted. This being true the suit was premature. In other words, the evidence showed a good cause of action existing in the plaintiff, although it may not have been existing in her at the time the suit was instituted, and although the suit may have, therefore, been prematurely brought. The plaintiff of course insists that in this view of the situation the defendant should have pleaded in abatement the prematurity of the suit—which it did not do. The trial court also seems to have taken this view. It seems quite plausible to argue that the defendant not having demurred specially to that part of the declaration alleging the service of the supplemental notice, and having failed to file a plea in abatement or other pleading raising the question that the supplemental notice was not filed before the suit was instituted and therefore that the suit was premature, is not in position to rely upon the failure of the plaintiff to prove that the supplemental notice was served before the suit was instituted. The declaration alleged

that the supplemental notice was served within 90 days after the accident. The defendant, by filing nothing but a plea of "not guilty," treated this allegation as sufficient, and by its said plea simply denied it. The plaintiff proved that said notice was served within 90 days after the accident—thereby sustaining the allegations of its declaration. But on the other hand an action at law is tried as of the time it is instituted, and if the plaintiff does not prove that at that time he had a good cause of action he is not entitled to recover, regardless of the fact that he may prove that he later and before the trial acquired and became vested with a good cause of action. As shown in City of Knoxville v. Felding, 153 Tenn., 586, causes of action are given against municipal corporations for negligent maintenance of streets only upon condition precedent that notice be served before the institution of suit, and if at the time a suit is instituted a proper notice has not already been served the plaintiff at said time has no cause of action.

In the cause at bar the technical record shows that the pauper oath was filed and the summons was issued on June 29, 1928, and it seems to us that the defendant having failed to question by special demurrer or otherwise the sufficiency of the allegations of the declaration as to the service of the supplemental notice which was served long before the expiration of 90 days, and Mr. O'Neil having testified (without being cross-examined) that he served the notice on the Mayor on June 29, 1928, his testimony might be regarded as establishing the fact that he served it before the institution of the suit. This, upon the presumption that he acted in compliance with the statute, and that his failure to so testify was a mere oversight.

One of the assignments of error is upon the ground that defendant was surprised at the plaintiff's testimony that her father, Charles A. Thompson, was only 63 years old at the time of his death, as she had previously informed the defendant's Director of Law that he was 68 years of age. This assignment also contains the following: "She also testified that her father was of sound body and in excellent health when newly discovered evidence indicates that he was not, and that at the time of his injuries he was actually drawing compensation for a forty-five per cent disability."

The trial began on Friday, January 11, 1929, and the plaintiff was the first witness. She testified on her direct examination that her father was 68 years of age at the time of his death, and that at the time of the accident he was sound and in good health. On cross-examintion she was asked only one question and that was about a hospital bill. She was then excused from the witness stand. Fourteen other witnesses testified without defendant raising any particular question about Thompson's age, and then court adjourned until Monday morning, January 14, 1929. On Monday morning the plain-

tiff was recalled to the witness stand for further cross-examination. Defendant's attorney asked her how old her father was at his death and she answered that he was 63 years of age at said time. She was then asked and answered as follows:

"Q. Aren't you mistaken to the extent of about five years as to your father's age, in other words, wasn't he sixty-eight at the time he was hurt instead of sixty-three? A. No, I give it in that way at first but when I went over, when I went home Mother said no, he was not.

"Q. You don't know anything about his age except what your mother told you? A. Well, I know that much and I believe it.

"Q. I say that's all you know about it? A. Well, I knew from time to time naturally when I was a growing child that his birthday was such and such."

After this testimony the plaintiff rested her case, and the defendant introduced five or six witnesses but never offered any proof whatever concerning Mr. Thompson's age.

On the hearing of the motion for new trial the defendant offered the affidavit of the Director of Law, Mr. W. H. Peters, Jr., that on May 16, 1928, Mr. Thompson's widow (plaintiff's mother) came to his office to discuss the claim against the City and among other things said that Mr. Thompson was 68 years old at the time of the accident. The defendant also offered the affidavit of its attorney, Mr. Frank Montgomery, that Mr. Peters had told him that Mrs. Thompson had said that Mr. Thompson was 68 years of age, and that thinking this was correct and not expecting any member of the family to testify that he was younger than 68 he (Montgomery) had made no further investigation of Mr. Thompson's age. Also that he did not know Mrs. Thompson's address and could not see her during the trial as she was ill. The defendant also offered the affidavit of Mrs. J. E. Pershing, a niece of Mr. Thompson to the effect that he was born in August, 1860. But none of these affidavits were incorporated in the bill of exceptions and there is therefore nothing in the record to which we can look showing or indicating that Mr. Thompson was more than 63 years of age at the time of the accident. Moreover, the casual manner in which the defendant's attorney treated the question of Mr. Thompson's age during the trial and his failure to offer Mr. Peters as a witness does not indicate that he attached much importance to the question of Mr. Thompson's age.

The defendant on the hearing of the motion for new trial introduced as a witness Mr. R. L. Pope, a practicing attorney at Knoxville. Mr. Pope testified that he represented a Mr. C. A. Thompson before the Workmen's Compensation Board of the State of Kentucky and on February 2, 1925, recovered a judgement in favor of said Thompson against the United States Coal & Coke Company for

$15 per week for 20 weeks and $5.40 per week for 314 weeks—said Thompson having received injuries in the mines of said company which said board had held had resulted in 45 per cent permanent partial disability. But Mr. Pope was unable to identify the man he represented as the Charles A. Thompson whose death is involved in this cause. The defendant also offered a certified copy of the final judgment rendered the Kentucky Compensation Board and an affidavit of its attorney attempting to show that his failure to offer Mr. Pope as a witness at the trial was not on account of any fault of his, etc. But neither the said certified copy nor the affidavit were incorporated in the bill of exceptions and of course we cannot look to them.

Another assignment of error is that the court erred in not granting a new trial on account of after discovered evidence of a proposed witness, S. P. O'Conner. An affidavit of Mr. S. P. O'Conner, was introduced in which he stated that he saw the accident and that it happened in a certain described manner, etc. But this affidavit was not incorporated in a bill of exceptions and we cannot look to it. Mr. O'Conner did not testify on the hearing of the motion for new trial, or if he did his testimony was not incorporated in the bill of exceptions.

The remaining assignment is that the amount of the judgment, $7,500, is excessive. The only evidence in the record that we can consider is that Mr. Thompson was 63 years of age, able bodied and in sound health. His expectancy was twelve and twenty-six one-hundredths years. He owned, lived on and farmed a tract of land near Knoxville, and he had some horses which he rented out to others. He and his wife do not seem to have been living together. Nor were any of his children living with him. However, his children were grown and married. He received severe and fatal injuries, but lived from May 9, 1928, until May 14, 1928, and although he was unconscious part of the time he must have suffered severely during the times he was conscious.

The jury brought in a verdict of $10,000, but the trial court suggested a remittitur of $2,500, which was made under protest. After consideration we are of the opinion that although $7,500, is full and ample it is not excessive, and we do not think that we should suggest a further remittitur.

It results that in our opinion there was no reversible error in the judgment of the trial court and the same will be affirmed, with costs.

Portrum and Snodgrass, JJ., concur.